**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TAILORED BRANDS, INC., *et al.*,[1] | ) | Case No. 20-33900 (MI) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | (Emergency Hearing Requested) |

# DEBTORS' EMERGENCY MOTION SEEKING ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO (I) PAY PREPETITION EMPLOYEE WAGES, SALARIES, OTHER COMPENSATION, AND REIMBURSABLE EMPLOYEE EXPENSES AND (II) CONTINUE EMPLOYEE BENEFITS PROGRAMS

**EMERGENCY RELIEF HAS BEEN REQUESTED. A HEARING WILL BE CONDUCTED ON THIS MATTER ON AUGUST 3, 2020 AT 4:30 P.M. (CENTRAL TIME) IN COURTROOM 404, 4TH FLOOR, 515 RUSK STREET, HOUSTON, TEXAS 77002. IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST EITHER APPEAR AT THE HEARING OR FILE A WRITTEN RESPONSE PRIOR TO THE HEARING. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**RELIEF IS REQUESTED NOT LATER THAN AUGUST 3, 2020.**

**PLEASE NOTE THAT ON MARCH 24, 2020, THROUGH THE ENTRY OF GENERAL ORDER 2020-10, THE COURT INVOKED THE PROTOCOL FOR EMERGENCY PUBLIC HEALTH OR SAFETY CONDITIONS.**

**IT IS ANTICIPATED THAT ALL PERSONS WILL APPEAR TELEPHONICALLY AND ALSO MAY APPEAR VIA VIDEO AT THIS HEARING.**

**AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT (832) 917-1510. YOU WILL BE RESPONSIBLE FOR YOUR OWN LONG-DISTANCE CHARGES. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE ISGUR'S CONFERENCE ROOM NUMBER IS 954554.**

**YOU MAY VIEW VIDEO VIA GOTOMEETING. TO USE GOTOMEETING, THE COURT RECOMMENDS THAT YOU DOWNLOAD THE FREE GOTOMEETING APPLICATION. TO CONNECT, YOU SHOULD ENTER THE MEETING CODE "JUDGEISGUR" IN THE GOTOMEETING APP OR CLICK THE LINK ON JUDGE ISGUR'S HOME PAGE ON THE SOUTHERN DISTRICT OF TEXAS WEBSITE. ONCE CONNECTED, CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**

**HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF THE HEARING. TO MAKE YOUR ELECTRONIC APPEARANCE, GO TO THE SOUTHERN**

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at http://cases.primeclerk.com/TailoredBrands. The location of the Debtors' service address in these chapter 11 cases is: 6100 Stevenson Boulevard, Fremont, California 94538.

**DISTRICT OF TEXAS WEBSITE AND SELECT "BANKRUPTCY COURT" FROM THE TOP MENU. SELECT "JUDGES' PROCEDURES & SCHEDULES," THEN "VIEW HOME PAGE" FOR JUDGE ISGUR. UNDER "ELECTRONIC APPEARANCE" SELECT "CLICK HERE TO SUBMIT ELECTRONIC APPEARANCE". SELECT "TAILORED BRANDS, INC. ET AL.", COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")[2] state as follows in support of this motion (this "Motion"):

**Relief Requested**

1. The Debtors seek entry of an order, substantially in the form attached hereto (the "Order"): authorizing the Debtors to (a) pay prepetition wages, salaries, other compensation, and reimbursable employee expenses; (b) continue employee benefits programs in the ordinary course, including payment of certain prepetition obligations related thereto; and (c) granting related relief.

**Jurisdiction and Venue**

2. The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court.

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

[2] A detailed description of the Debtors and their business, and the facts and circumstances supporting the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Holly Etlin, Chief Restructuring Officer of Tailored Brands, Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), on August 2, 2020 (the "Petition Date"). Capitalized terms used but not otherwise defined in this Motion shall have the meanings given to them in the First Day Declaration.

4. The bases for the relief requested herein are sections 105(a), 362(d), 363(b), and 507(a) of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004, and rule 9013-1(b) of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

## Background

5. The Debtors are a leading specialty retailer of men's tailored clothing and the largest men's formalwear provider in the United States and Canada. The Debtors operate approximately 1,400 stores throughout the United States and Canada through an omni-channel network of five retail brands (Men's Wearhouse, Men's Wearhouse and Tux, Jos. A. Bank, K&G, and Moores). As of the Petition Date, the Debtors operate 1,274 stores across the United States and 125 stores in Canada. The Debtors also maintain a substantial online presence.

6. On the Petition Date, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors have also filed a motion requesting joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no official committees have been appointed or designated.

## The Debtors' Workforce

7. As of the Petition Date, the Debtors employ approximately 18,000 employees (the "Employees"), including approximately 13,000 full-time employees and approximately 5,000 part-time and seasonal employees. Approximately 920 Employees are members of a labor force union (the "Union Employees"). In addition to the Employees, the Debtors also periodically retain independent contractors and temporary workers (collectively, the "Temporary Staff") sourced regularly from various staffing agencies (the "Staffing Agencies") to fulfill certain duties

on a short- and long-term basis. At any given time, the Debtors retain approximately 750 Temporary Staff. Starting in March, in response to government mandates to close all non-essential businesses due to COVID-19, the Debtors temporarily furloughed approximately 97 percent of their Employees and Temporary Staff. As of the Petition Date, approximately 7,700 Employees and Temporary Staff remain furloughed.

8. The Employees and Temporary Staff perform a wide variety of functions, which are critical to the preservation of value and the administration of the Debtors' estates. In many instances, the Employees and Temporary Staff include personnel who are intimately familiar with the Debtors' business, processes, and systems, and who cannot be easily replaced. Without the continued, uninterrupted services of the Employees and the Temporary Staff, the Debtors' business operations will be materially impaired.

9. Further, the vast majority of the Employees and Temporary Staff rely on their compensation and benefits to pay their daily living expenses. These workers will be unfairly harmed if the Debtors are not permitted to continue paying compensation and providing health and other benefits during these chapter 11 cases. Consequently, the Debtors respectfully submit that the relief requested herein is necessary and appropriate under the facts and circumstances of these chapter 11 cases.

**Employee Compensation and Benefits**

10. To minimize the personal hardship the Employees and Temporary Staff could suffer if prepetition Employee-related obligations remain unpaid during the administration of these chapter 11 cases, the Debtors seek authority, but not direction, to: (a) pay and honor certain prepetition claims relating to, among other things, wages, salaries, sales commissions, other compensation, payroll services, federal and state withholding taxes and other amounts withheld (including garnishments, Employees' share of insurance premiums, and taxes), reimbursable

expenses, the non-insider employee incentive plans, the non-insider employee severance program, health insurance, retirement health and related benefits, workers' compensation benefits, life insurance, short- and long-term disability coverage, and certain other benefits that the Debtors have historically provided in the ordinary course (collectively, the "Employee Compensation and Benefits"); and (b) pay all costs incident to the Employee Compensation and Benefits.

11. Subject to the Court's approval, the Debtors intend to honor the applicable prepetition Employee Compensation and Benefits programs in the ordinary course on a postpetition basis. Out of an abundance of caution, the Debtors further request authority to modify, change, or discontinue any of their Employee Compensation and Benefits and to implement new programs, policies, and benefits in the ordinary course during these chapter 11 cases in the Debtors' sole discretion without the need for further Court approval, subject to applicable law. The Debtors seek authority to make the following payments related to prepetition amounts owed on account of the Employee Compensation and Benefits:

| Relief Sought | Final Amount |
|---|---|
| **Compensation and Withholding Obligations** | |
| Compensation | $13,750,000 |
| Commissions Program | $325,000 |
| Temporary Staff Compensation | $3,300,000 |
| Withholding Obligations | $8,600,000 |
| Reimbursable Expenses | $25,000 |
| Credit Card Expenses | $50,000 |
| **Employee Benefits Programs** | |
| Health Benefit Plans | $6,800,000 |
| Basic Life Insurance | $110,000 |
| Disability Benefits | $300,000 |
| Wellness Programs | $30,000 |
| Adoption Assistance Program | $0 |
| Education Assistance Program | $0 |
| Workers' Compensation Programs | $4,100,000 |
| Union Payments | $650,000 |
| Retirement Plans | $50,000 |
| Paid Time Off | $24,100,000 |
| **TOTAL** | $62,190,000 |

## I. Compensation and Withholding Obligations.

### A. Unpaid Compensation.

12. The Debtors incur obligations to their Employees for, among other things, wages, salaries, overtime, and other obligations described herein (collectively, the "Employee Compensation"). The Debtors' historical average monthly gross Employee Compensation, including wages, salaries, commissions, and related compensation, has been approximately $48.6 million. The Debtors pay approximately 16,000 Employees—approximately 89 percent of their workforce—on an hourly basis (the "Hourly Employees") and the remaining 2,000 Employees—approximately 11 percent of the workforce—are paid on a salaried basis (the "Salaried Employees"). The Debtors pay most of their Employees (both Hourly Employees and Salaried Employees) on a bi-weekly basis, while some of the Hourly Employees are paid weekly.

13. The Debtors anticipate that their monthly gross Employee Compensation, including wages, salaries, and related compensation, will range from approximately $35 million to approximately $55 million during the pendency of these chapter 11 cases.[3] As of the Petition Date, the Debtors estimate that they owe approximately $13.75 million on account of unpaid Employee Compensation earned by Employees prior to the Petition Date (the "Unpaid Compensation"), all of which will come due within the first 21 days of these chapter 11 cases. The majority of the Debtors' payroll is made by direct deposit through electronic transfer of funds to the Employees' bank accounts or other electronic means. Failure to pay the Unpaid Compensation will result in financial hardship for the Employees and lead to the risk of widespread departures at all levels of the Debtors' corporate structure. In light of the substantial benefit the Employees will continue to provide to the Debtors' estates and the costs attendant to filling sudden vacancies, the Debtors hope to avoid imposing such a hardship.

14. The Debtors request authority, but not direction, to pay any Unpaid Compensation in the ordinary course and consistent with past practice and to continue paying the Employee Compensation in the ordinary course. For the avoidance of doubt, as of the Petition Date, the Debtors do not believe that they owe Unpaid Compensation to any Employee in excess of the $13,650 statutory cap imposed by section 507(a)(4) of the Bankruptcy Code.

**B. Non-Insider Commission Compensation.**

15. In addition to the Debtors' salary and wage obligations, certain of the non-insider Employees are entitled to sales commissions in addition to their base salary wages under the sales

---

[3] Employee Compensation is expected to decrease throughout these chapter 11 cases as a result of contemplated store closings. The Debtors' planned store closings are discussed in more detail in *Debtors' Motion Seeking Entry of an Order (I) Approving and Authorizing the Conduct of the Inventory Drawback Procedures and (II) Granting Related Relief*, filed contemporaneously herewith.

commissions program (the "Commissions Program"). In particular, the Debtors pay commissions to approximately 6,400 Employees pursuant to the Commissions Program. The amount of commissions due to any one Employee under the Commissions Program depends on performance-based sale components, such as quantity of sales, aggregate value of the sold merchandise, and seasonal sales goals.

16. The commissions are paid bi-weekly, as applicable, and processed as part of the Debtors' normal payroll. The commissions form an important and integral part of many of the Employees' overall compensation packages and motivate the Employees to maintain customer goodwill and efficiently pursue the sale of the Debtors' inventory—both of which inure to the benefit of the Debtors' estates. Additionally, many of the Employees rely on the commissions earned through the Commissions Program for their daily living expenses such that failure to pay the commissions would impose undue hardship.

17. As of the Petition Date, the Debtors estimate that they owe approximately $325,000 on account of accrued but unpaid commissions. The Debtors seek authority to pay any outstanding amounts on account of the Commissions Program and to continue the Commissions Programs on a postpetition basis in the ordinary course of the Debtors' business and consistent with past practice.

**C. Temporary Staff Compensation.**

18. The Debtors make payments to Staffing Agencies and the Temporary Staff (the "Temporary Staff Compensation") for the performance of certain services important to the Debtors' operations. The Employees rely on the support of Temporary Staff to complete discrete projects in furtherance of the Debtors' business and to fill short-term positions. Historically, the Debtors have paid approximately $1.5 million in Temporary Staff Compensation on a monthly basis, which includes fees that the Debtors remit to Staffing Agencies in exchange for the services

they provide with respect to the Temporary Staff. The Debtors believe the authority to continue paying the Temporary Staff Compensation is important to minimizing disruption of the Debtors' business operations.

19. As of the Petition Date, the Debtors estimate that Temporary Staff and Staffing Agencies are owed an aggregate of approximately $3.3 million on account of accrued services rendered prior to the Petition Date (collectively, the "Unpaid Temporary Staff Compensation"). The Debtors request authority to continue to pay any Unpaid Temporary Staff Compensation in the ordinary course and consistent with past practice and to continue paying the Temporary Staff Compensation in the ordinary course of business on a postpetition basis.

**D. Withholding Obligations and Payroll Taxes.**

20. During each applicable payroll period, the Debtors routinely deduct certain amounts from Employees' paychecks, including garnishments, child support, and similar deductions, as well as other pre-tax and after-tax deductions payable pursuant to certain employee benefit plans discussed herein, such as an Employee's share of health care benefits and insurance premiums, 401(k) contributions, legally-ordered deductions, and miscellaneous deductions (collectively, the "Deductions"), and forward such amounts to various third-party recipients.

21. In addition to the Deductions, certain federal and state laws require that the Debtors withhold certain amounts from Employees' gross pay related to federal, state, and local income taxes, as well as Social Security and Medicare taxes (collectively, the "Employee Payroll Taxes") for remittance to the appropriate federal, state, or local taxing authorities. The Debtors must then match the Employee Payroll Taxes from their own funds and pay, based upon a percentage of gross payroll, additional amounts for federal and state unemployment insurance and Social Security and Medicare taxes (together with the Employee Payroll Taxes, the "Payroll Taxes," and, the Payroll Taxes, together with the Deductions, collectively, the "Withholding Obligations").

The Payroll Taxes are generally processed and forwarded to the appropriate federal, state, and local taxing authorities at the same time the Employees' payroll checks are disbursed.

22. In the 12 months before the Petition Date, the Debtors remitted approximately $164 million of Withholding Obligations in the aggregate. As of the Petition Date, the Debtors estimate that they owe approximately $8.6 million on account of the Withholding Obligations. The Debtors seek authority to continue deducting and remitting amounts to the appropriate third-parties, as applicable, in a manner consistent with historical practice for any unpaid Withholding Obligations and to continue to honor the Withholding Obligations in the ordinary course of business on a postpetition basis and consistent with past practice.

**E. Reimbursable Expenses.**

23. Prior to the Petition Date and in the ordinary course, the Debtors reimburse Employees or pay credit card invoices of certain Employees for approved expenses incurred in connection with the performance of their assigned duties (the "Reimbursable Expenses"). The Reimbursable Expenses are largely on account of costs incurred related to (a) Employee travel for reasonable business related purposes, (b) purchases of merchandise, or (c) payments to vendors for services. Employees who pay up front for Reimbursable Expenses apply for reimbursement of Reimbursable by submitting monthly expense reports with detailed receipts of all costs incurred (the "Expense Reports"). The Employee's direct manager and the travel and expense department review each submitted Expense Report. Typically, Expense Reports are approved within a week after submission and reimbursements are processed two times per week.

24. The Debtors direct all business-related travel through ETA Travel (the "Travel Agent"). Over the past 12 months, the Debtors have paid approximately $106,000 in administration fees to the Travel Agent (the "Travel Agency Fees"). As of the Petition Date, the Debtors do not owe any accrued but unpaid Travel Agency Fees. As a result, the Debtors seek

authority to continue to pay the Travel Agency Fees in the ordinary course of business on a postpetition basis.

25. Although the Debtors ask that reimbursement requests be submitted promptly, submission delays occasionally occur, and Employees may submit reimbursement requests for prepetition expenses after the Petition Date. Employees incurred the Reimbursable Expenses as business expenses on the Debtors' behalf and with the understanding that such expenses would be reimbursed fully. In the 12 months before the Petition Date, the Debtors spent approximately $5.3 million on Reimbursable Expenses. As of the Petition Date, the Debtors estimate that Reimbursable Expenses are owed in the aggregate of approximately $25,000 on account of accrued services rendered prior to the Petition Date (the "Unpaid Reimbursable Expenses"). The Debtors request authority to pay the Unpaid Reimbursable Expenses in the ordinary course and consistent with past practice and to continue paying the Reimbursable Expenses in the ordinary course on a postpetition basis.

26. The Debtors provide certain Employees with corporate credit cards (the "Corporate Credit Cards"). Currently, approximately 371 Corporate Credit Cards are used by Employees. The Corporate Credit Cards are issued to Employees in each Employee's own name at the discretion of senior managers and monthly invoices are sent to the Company. American Express issues the Corporate Credit Cards. Employees may use the Corporate Credit Cards to purchase business-related goods and services that require a credit card at the time of purchase, catering, supplies for corporate events, goods and services related to the administration of corporate meetings, floral services for hospitalized employees, photo shoot supplies, dues and subscriptions, and certain supply purchases of less than $100. All purchases made with the Corporate Credit Cards must be less than $3,000 unless approved by the Debtors' travel and expense department.

Employees may not use the Corporate Credit Cards for goods or services requiring a purchase order, temporary labor, consultancy services, cash advances, charitable donations, gift cards, lease payments, or business-related travel expenses. The Debtors are liable on account of the Corporate Credit Cards and must make payments in a timely manner. In the 12 months before the Petition Date, the Debtors spent approximately $32 million on account of the Corporate Credit Cards (the "Corporate Credit Card Expenses"). As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid amounts owed on account of the Corporate Credit Cards is approximately $50,000 (the "Unpaid Corporate Credit Card Expenses"). The Debtors request authority to pay the Unpaid Corporate Credit Card Expenses in the ordinary course and consistent with past practice and to continue paying the Corporate Credit Card Expenses in the ordinary course on a postpetition basis.

**F. Non-Insider Employee Severance Programs**

27. In the ordinary course of business, the Debtors provide severance benefits to certain store and store related Employees in the event of a termination by the Debtors that is not for "cause" (the "Non-Insider Employee Severance Program"). Under the Non-Insider Employee Severance Program, Employees receive, upon a qualifying termination, payment determined by a combination of the Employee's salary, job title, and length of time employed by the Debtors equal to a minimum of four (4) weeks and a maximum of twelve (12) weeks of pay. Payment of the severance benefits is made over a period of time. In addition, certain of the Debtors' CBAs require severance to be made to terminated Union Employees (the "Union Severance Program").

28. As of the Petition Date, the Debtors do not believe there are any outstanding prepetition amounts owed pursuant to the Non-Insider Employee Severance Program or the Union Severance Program. Therefore, the Debtors seek authority to continue the Non-Insider Severance Program for all eligible non-Insider Employees in the ordinary course of business and the Union

Severance Program, as provided in the applicable CBAs and agreed to between the Debtors and the applicable Union, on a postpetition basis.

## II. Non-Insider Employee Incentive Programs.

29. The Debtors maintain several incentive programs to motivate, reward, and retain certain of their non-insider Employees (each defined herein and collectively, the "Non-Insider Employee Incentive Programs").

### A. Store Employee Bonus Program.

30. The Debtors previously maintained a number of incentive programs to drive performance among their Employees, including store and corporate bonus programs. The Debtors offered bonuses to retail Employees based on myriad factors including the particular Employee's performance, store "shrinkage reduction," sales targets, and payroll hour targets (the "Store Employee Bonus Program"). The store Employee bonuses are paid annually each spring (the "Store Employee Bonus Payments"), with the most recent Store Employee Bonus Payment made on April 17, 2020 in the amount of $8.3 million in the aggregate to 10,203 Employees. As of the Petition Date, the Store Employee Bonus Program is suspended indefinitely. The Debtors currently have no outstanding obligations to Employees on account of the Store Employee Bonus Program, but include this description out of an abundance of caution and seek authority to remit any Store Employee Bonus Payments if any become due during the pendency of these chapter 11 cases.

### B. Corporate Non-Management Bonus Program.

31. The Debtors also offer previously discretionary bonuses to corporate, non-insider Employees (all full-time, non-management Employees) based on their performance reviews (the "Corporate Non-Management Bonus Program"). The performance review factors include various performance objectives comprised of objective and subjective corporate-wide, subsidiary,

division, operating unit, or individual measures, all of which are used to calculate an Employee's overall performance review score. The amounts paid under the Corporate Non-Management Bonus Program (the "Incentive Compensation Payments") are paid annually, with the most recent Incentive Compensation Payment made on February 21, 2020, totaling $2.3 million across 502 Employees. As of the Petition Date, the Corporate Non-Management Bonus Program is suspended indefinitely. The Debtors currently have no outstanding obligations to Employees on account of the Corporate Non-Management Bonus Program, but include this description out of an abundance of caution and seek authority to remit any Incentive Compensation Payments if any become due during the pendency of these chapter 11 cases

**C. Employee Discount.**

32. Employees are entitled to a discount off merchandise in the Debtors' stores and on the Debtors' website (the "Employee Discount"). The Employee Discount ranges from 20 to 75 percent depending on the type of merchandise, the store in which the product is sold, and the store where the Employee works. The Employee Discount is taken at the point of sale, so the Debtors are not liable for any amounts on account of the Employee Discount. The Debtors request the authority, but not direction, to continue the Employee Discount in the ordinary course of business on a postpetition basis.

33. The Debtors also maintain a program to allow Employees to pay for merchandise through automatic payroll deductions (the "Merchandise Purchase Payroll Deduction Program"). After 90 days of continuous employment, Employees are eligible to purchase merchandise with the Employee Discount and have the cost of the merchandise deducted from the Employee's paycheck. The Debtors apply earned Employee Compensation, including any bonuses, to the cost of merchandise purchased through the Merchandise Purchase Payroll Deduction Program. In the 12 months before the Petition Date, Employees purchased approximately $7.5 million worth of

merchandise through Merchandise Purchase Payroll Deduction Program. As of the Petition Date, the Debtors are owed approximately $152,000 for merchandise bought through the Merchandise Purchase Payroll Deduction Program. The Debtors request the authority, but not direction, to continue the Merchandise Purchase Payroll Deduction Program in the ordinary course of business on a postpetition basis.

## III. Employee Benefits Programs.

34. The Debtors offer all of their Employees the ability to participate in a number of insurance and benefits programs, including, among other programs, medical and dental plans, life insurance, accidental death and dismemberment insurance, accident insurance, scholarship programs, disability benefits, workers' compensation, retirement plans, paid time off, and other employee benefit plans (collectively, the "Employee Benefits Programs").

35. As described below, failure to continue the Employee Benefits Programs could cause Employees to experience severe hardship. In light of the substantial benefits the Employees have provided and will continue to provide to the Debtors' estates, the Debtors wish to avoid imposing such a hardship. The Debtors seek authority, but not direction, to continue to provide Employee Benefits Programs in the ordinary course on a postpetition basis during the administration of these chapter 11 cases. As of the Petition Date, the Debtors estimate that they do not owe any amounts on account of the Employee Benefits Programs. The Employee Benefits Programs are described in greater detail below.

### A. Health Benefit Plans.

36. The Debtors offer their Employees the opportunity to participate in a number of health benefit plans, including medical and dental plans (collectively, the "Health Benefit Plans"). Specifically, the Debtors provide the following:

- Healthcare Plan: The Debtors' healthcare plans (the "Healthcare Plans") are administered by Aetna, Blue Cross Blue Shield, Cigna, Kaiser Permanente, and Sun Life. The Debtors estimate that the ongoing monthly administrative cost of these Healthcare Plans will be approximately $4.8 million. As of the Petition Date, the Debtors estimate that they owe approximately $2.6 million under the Healthcare Plans. The Debtors' prescription drug plan is administered by Caremark, L.L.C./CaremarkCVS Health, L.L.C (the "Prescription Plan"). The Debtors estimate that there are approximately $4.2 million of incurred but not reported medical and prescription drug expenses and insurance claims. The Debtors maintain stop loss insurance coverage to cover all amounts due in excess of $500,000 under any individual claim (the "Stop Loss Insurance"). The Debtors pay the excess amounts and are subsequently reimbursed under the Stop Loss Insurance. The monthly premium for the Stop Loss Insurance is $176,864. The Debtors also offer continued health care coverage under COBRA to eligible Employees.

- Dental Plan: Additionally, the Debtors offer their Employees the option of participating in a dental plan (the "Dental Plans") administered by Delta Dental, Sun Life, and, in some areas, Aetna. The Debtors do not make contributions to or pay any expenses on account of the Dental Plans.

- Vision Plans: The Debtors offer their Employees the option of choosing between two vision plans (the "Vision Plans") administered by Vision Services Plan, Sun Life, EyeMed and Davis Vision. The Debtors do not make contributions to or pay any expenses on account of the Vision Plans.

The Debtors estimate that they do not owe any amounts on account of the Health Benefit Plans. The Debtors seek authority to continue the Health Benefit Plans on a postpetition basis in the ordinary course of business.

37. The Debtors also provide their eligible Employees with access to several types of flexible spending accounts: the Health Care Flexible Spending Account, the Commuter FSA, and the Dependent Care FSA (each, an "FSA"), with each FSA administered by WageWorks. The FSAs allow participating Employees to contribute pre-tax dollars for eligible out-of-pocket expenses. The Debtors do not make any contributions to the FSAs.

38. Because the Debtors do not contribute to Employees' FSAs, the Debtors believe the FSA amounts are generally held in trust by the Debtors and are not property of their estates.

When an Employee seeks to use their elected FSA amounts, the Debtors remit such amount to the requested healthcare provider through WageWorks. As of the Petition Date, the Debtors estimate that there is approximately $225,000 to be remitted on account of the FSA (the "Unremitted FSA Amounts").

39. Further, the Debtors pay a monthly administration fee of approximately $2,000 to WageWorks on account of the FSA programs. As of the Petition Date, the Debtors estimate that they do owe approximately $2,000 on account of accrued but unpaid FSA fees (the "Unpaid FSA Fees," and, together with the Unremitted FSA Amounts, the "Unpaid FSA Costs"). As a result, the Debtors seek authority to pay and/or remit the Unpaid FSA Costs in the ordinary course and consistent with past practice and to continue the FSAs in the ordinary course of business on a postpetition basis.

40. For certain Employees who participate in the high deductible Healthcare Plans, the Debtors offer access to a health savings account (each, an "HSA") through WageWorks. Participating Employees can opt to make pre-tax contributions to their individual HSA through payroll deductions to cover reimbursements under the program up to the maximum amount permitted by the Internal Revenue Service. In the 12 months preceding the Petition Date, the Employees contributed approximately $1.6 million to the HSAs, and the Debtors incurred costs of approximately $581,000 over that same span (together, the "HSA Costs"). As of the Petition Date, the Debtors estimate that they owe approximately $50,000 on account of accrued but unpaid HSA Costs. The Debtors seek authority, but not direction, to continue the HSAs in the ordinary course of business on a postpetition basis.

41. As a part of the FSAs and the HSAs, the Debtors maintain a health reimbursement account (the "HRA") through WageWorks. The HRA is a notational account that the Debtors fund

to support Employee claims under the FSAs and HSAs. The Debtors fund up to $600 for Employees who participate in a FSA and up to $1,200 for Employees who participate in an HSA. The Debtors pay a monthly administration fee of approximately $11,000 to WageWorks on account of the HRA. As of the Petition Date, the Debtors estimate that they owe approximately $11,000 on account of the HRA. As a result, the Debtors seek authority to continue the HRA in the ordinary course of business on a postpetition basis.

**B. Other Insurance, Disability Benefits, and Employee Assistance Programs.**

42. The Debtors offer their employees certain life insurance, disability benefits, and other auxiliary benefits described further below. The Debtors estimate that they do not owe any unpaid insurance amounts in the ordinary course of business, but seek authority to continue to honor any related obligations in the ordinary course on a postpetition basis.

**1. Life Insurance Program.**

43. The Debtors provide life and accidental death and dismemberment insurance (the "Basic Life Insurance") to eligible Employees through Lincoln Financial Group and Sun Life. The Debtor-funded life insurance benefit is in the amount of the Employee's annual base salary (rounded to the next higher $1,000) and capped at $500,000 per Employee (the "Basic Life Payments"). As of the Petition Date, the Debtors estimate that they owe approximately $300,000 on account of the Basic Life Insurance. The Debtors request authority to pay prepetition amounts on account of the Basic Life Payments and to continue the Basic Life Insurance program in the ordinary course of business on a postpetition basis.

44. Certain eligible Employees also may purchase voluntary life insurance and accidental death and dismemberment insurance (the "Voluntary Life and AD&D Insurance") through Lincoln Financial and Sun Life. The Voluntary Life and AD&D Insurance premiums are

paid by the Debtors' Employees, and the Debtors do not have any other obligations under the Voluntary Life and AD&D Insurance.

**2. Disability Benefits.**

45. The Debtors provide certain disability benefits through Lincoln Financial Group and Sun Life (the "Disability Benefits") to their eligible Employees. The Debtors provide a short-term disability insurance benefit to eligible Employees, which replaces a portion of the Employee's income if the Employee is unable to work due to a non-work related injury, illness, or medical condition. The benefit amount is 55 percent of an Employee's weekly earnings, to a maximum of $1,300 per week, and will pay for up to 24 weeks after a one week waiting period. The Debtors also provide a long-term disability insurance benefit to eligible Employees, which replaces a portion of the Employee's income if such Employee is disabled for 24 weeks or longer due to a non-work-related injury or illness for an extended period of time. The benefit amount is 40 percent of the monthly pre-disability earnings, to a maximum benefit of $3,000 per month.

46. In the 12 months preceding the Petition Date, the Debtors incurred costs of approximately $4.1 million on account of the Disability Benefits. As of the Petition Date, the Debtors estimate that they owe approximately $300,000 on account of the Disability Benefits. The Debtors request authority to pay prepetition amounts on account of the Disability Benefits and to continue the Disability Benefits program in the ordinary course of business on a postpetition basis.

**3. Other Insurance and Assistance Programs.**

47. The Debtors also offer accident insurance through MetLife (the "Accident Insurance Plan"). The Debtors are not obligated to make any payments under the Accident Insurance Plan, and all premiums are covered by the Employees.

48. The Debtors also provide their Employees with a confidential counseling and referral service (the "Employee Assistance Program") that pairs Employees with clinicians and a

variety of other resources. The Employee Assistance Program is administered by Magellan and HumanaCare. As of the Petition Date, the Debtors do not believe they owe any amounts pursuant to the Employee Assistance Program and request authority to continue the Employee Assistance Program in the ordinary course of business on a postpetition basis.

49. Additionally, the Debtors offer their eligible Employees the option to participate in various wellness programs (collectively, the "Wellness Programs"). These programs include: access to fitness resources, nutrition advice, a weight loss program, a smoking cessation program, and counseling sessions. The Debtors engage the services of Quest, Redbrick, and Virgin Pulse in order to implement the Wellness Programs. In the 12 months prior to the Petition Date, the Debtors spent approximately $366,000 on the Wellness Programs. As of the Petition Date, the Debtors estimate that they owe approximately $30,000 on account of the Wellness Programs. The Debtors request authority to pay prepetition amounts on account of the Wellness Programs and to continue Wellness Programs in the ordinary course of business on a postpetition basis.

50. The Debtors also offer their eligible Employees the option to participate in a legal services plan (the "Legal Services Plan"). The Legal Services Plan provides free or discounted legal services for issues including will preparation, real estate matters, and traffic offenses. The Debtors engage the services of Hyatt Voluntary Legal in order to implement the Legal Services Plan. The Debtors are not obligated to make any payments under the Legal Services Plan, and all expenses are covered by the Employees. As of the Petition Date, the Debtors request authority to continue the Legal Services Plan in the ordinary course of business on a postpetition basis.

51. Additionally, the Debtors offer their eligible Employees the option to participate in an adoption assistance program (the "Adoption Assistance Program"), which provides financial assistance for the costs of adoption. The Debtors self-administer the Adoption Assistance

Program. In the 12 months prior to the Petition Date, the Debtors had no expenses related to the Adoption Assistance Program. As of the Petition Date, the Debtors do not believe they owe any amounts pursuant to the Adoption Assistance Program and request authority to continue the Adoption Assistance Program in the ordinary course of business on a postpetition basis.

52. The Debtors also offer their eligible Employees the option to participate in various education assistance programs (collectively, the "Education Assistance Programs"). The Education Assistance Programs include a program that reimburses a portion of eligible education expenses for those Employees who continue their education. The Debtors also provide college scholarships to Employees' children. The Debtors administer and implement the Education Assistance Programs themselves. In the 12 months prior to the Petition Date, the Debtors spent approximately $201,000 on the Education Assistance Programs. As of the Petition Date, the Debtors do not believe they owe any amounts pursuant to the Education Assistance Programs and request authority to continue the Education Assistance Programs in the ordinary course of business on a postpetition basis.

**C. Workers' Compensation Program.**

53. The Debtors maintain workers' compensation insurance for their Employees at the statutorily required level for each jurisdiction in which the Debtors have Employees (collectively, the "Workers' Compensation Program"). In certain jurisdictions, the Debtors pay premiums based on payroll in accordance with statutory requirements. The Debtors also maintain a master policy for all states that do not have statutory requirements that is subject to a $500,000 deductible. The Debtors maintain and administer insurance coverage for the Workers' Compensation Program through the Safety National Casualty Corp., Gallagher Bassett, and ConClaim (collectively, the "Workers' Compensation Administrators").

54. The Workers' Compensation Administrators open new claims and pays benefits on behalf of the Debtors. The Debtors pay approximately $630,000 in premiums and fees annually to maintain the Workers' Compensation Program (the "Workers' Compensation Coverage Fees"). As of the Petition Date, the Debtors estimate that they do not owe any amounts on account of accrued but unpaid Workers' Compensation Coverage Fees.[4]

55. The Debtors also attempt to negotiate general releases in exchange for the settlement of some Employee claims under the Workers' Compensation Program (the "Employment Claims Settlements"). As of the Petition Date, the Debtors do not believe they have any accrued but unpaid fees on account of the Employment Claims Settlements.

56. The Debtors must continue the claim assessment, determination, adjudication, and payment process pursuant to the Workers' Compensation Program without regard to whether such liabilities are outstanding before the Petition Date to ensure that the Debtors comply with applicable workers' compensation laws and requirements. There are approximately 180 open claims in the amount of $15.8 million under the Workers' Compensation Program (the "Workers' Compensation Claims"). As of the Petition Date, the Debtors have paid $11.9 million of the Workers' Compensation Claims and hold $3.9 million in reserve to pay the remaining amounts as they become due and owing.

[4] Certain states have unique workers' compensation requirements: Ohio requires bimonthly installments; Washington requires quarterly installments; North Dakota requires an annual payment; and Wyoming requires quarterly payments. Pursuant to the *Debtors' Emergency Motion Seeking Entry of an Order Authorizing the Debtors to (I) Pay Their Obligations Under Insurance Policies Entered into Prepetition, (II) Continue to Pay Brokerage Fees, (III) Renew, Supplement, Modify, or Purchase Insurance Coverage, and (IV) Continue to Pay Workers' Compensation Coverage Fees*, filed contemporaneously herewith (the "Insurance Motion"), the Debtors are requesting authorization to pay all premiums, claims and fees in respect of their insurance policies, including any premiums, claims and fees in respect of the Workers' Compensation Program that come due during the pendency of these chapter 11 cases.

57. Because the Debtors are statutorily and/or contractually obligated to maintain the Workers' Compensation Program, their inability to do so may result in adverse legal consequences that disrupt the reorganization process. The Debtors seek authority, but not direction, to: (a) continue the Workers' Compensation Program in the ordinary course of business on a postpetition basis;[5] and (b) modify the automatic stay solely to allow Employees to assert claims under the Workers' Compensation Program, which will be covered 100 percent by the Debtors' insurer beyond an initial $500,000 deductible.

**D. Union Benefits.**

58. The Debtors' Union Employees are members of one of the three following unions (collectively, the "Unions"): (a) Unite Here; (b) Mid-Atlantic Joint Board, Local 806; and (c) Local 340, New York New Jersey Regional Joint Board, Workers United. The Union Employees work at stores located in: New Bedford, Massachusetts; Hampstead, Maryland; New York; and New Jersey. As of the Petition Date, the Debtors are party to three collective bargaining agreements with local chapters of the Unions (the "CBAs"). Each of the CBAs expires in 2022 or later. In 12 months preceding the Petition Date, the Debtors paid approximately $520,000 in dues to the Unions (the "Union Dues"). As of the Petition Date, the Debtors estimate that they owe approximately $40,000 on account of unpaid Union Dues (the "Unpaid Union Dues").

59. Most Union Employees' retirement benefits are administered by the Unions themselves and not the Debtors. In accordance with the CBAs, the Debtors make monthly contributions to the Amalgamated National Health Fund, Empower Retirement, WageWorks,

[5] The Workers' Compensation Program may change postpetition in the ordinary course of business due to changes in applicable laws and regulations and the Debtors' ability to meet requirements thereunder. The Debtors request authority to continue the Workers' Compensation Program postpetition, including making any changes to current policy and practices that become necessary, subject to applicable law.

Guardian, Wells Fargo, Alicare, ACDRIT, Total Administrative Services Corporation, and National Plus (collectively, the "Union Benefit Providers") to provide health, welfare, and retirement benefits to certain Union Employees (the "Union Benefit Contributions"). Historically, the Debtors have made average monthly Union Benefit Contributions of $541,500 to the Union Benefit Providers. The Union Employees contribute to certain of the plans administered by the Union Benefit Providers, with such contributions totaling approximately $161,100. As of the Petition Date, the Debtors estimate that they owe approximately $610,000 on account of the Union Benefit Contributions (the "Unpaid Union Benefit Contributions" and, together with the Unpaid Union Dues, the "Unpaid Union Payments"). The Debtors seek authority pay the Unpaid Union Payments and to continue such payments in the ordinary course of business on a postpetition basis.

**E. Retirement Plans.**

60. The Debtors offer retirement plans in the form of a 401(k) defined contribution plan and a pension plan (collectively, the "Retirement Plans"). The Debtors seek authority, but not direction, to pay any prepetition amounts owed on account of the Retirement Plans and to continue honoring their Retirement Plans obligations on a postpetition basis in the ordinary course of business and in a manner consistent with past practices.

**1. The 401(k) Plan**

61. The Debtors offer eligible Employees the opportunity to participate in a 401(k) plan (the "401(k) Plan"). The 401(k) Plan generally provides for pre-tax salary deductions of compensation up to limits set by the Internal Revenue Code. The Debtors provide a matching contribution, which is 30 percent of the first 6 percent they contribute (the "401(k) Contributions"). The match is made annually. The 401(k) Plan is administered by Empower Retirement ("Empower") and allows for automatic pre-tax wage deductions of eligible compensation up to the limits set forth by the Internal Revenue Code.

62. Each pay period, the Debtors deduct the Employees' 401(k) contributions from the Employees' paychecks (the "401(k) Deductions") and hold such amounts in trust until they are forwarded to Empower. The Debtors deduct approximately $1.9 million in the aggregate each month from Employee's paychecks on account of the 401(k) Deductions. As of the Petition Date, the Debtors estimate that they are current on account of the 401(k) Deductions (the "Unremitted 401(k) Deductions") but include this description out of an abundance of caution and seek authority to remit Unremitted 401(k) Deductions if any become due during the pendency of these chapter 11 cases.

63. In the 12 months before the Petition Date, the Debtors' monthly payments and disbursements on account of 401(k) Contributions averaged approximately $365,000. As of the Petition Date, the Debtors estimate that they owe approximately $29,000 on account of 401(k) Contributions (the "Unpaid 401(k) Contributions"). The Debtors also pay SageView Advisory Group, Buck, and Empower Retirement (the "401(k) Advisors") monthly administrative fees in the aggregate amount of $8,208 (the "401(k) Advisor Fees"). As of the Petition Date, the Debtors owe approximately $21,000 on account of the 401(k) Advisor Fees to the 401(k) Advisors. The Debtors seek authority to honor their commitment to 401(k) Contributions (whether due prepetition or arising postpetition), as well as payments to the 401(k) Advisors, in the ordinary course of business on a postpetition basis.

64. Many Employees' retirement savings solely consist of the 401(k) Plan, and many Employees choose to participate in the 401(k) Plan because of the 401(k) Contribution provision. Continuing the 401(k) Plan and the 401(k) Contributions are essential to maintaining Employee morale and protecting Employee expectations. In addition, the Debtors believe that the 401(k) Deductions are generally held in trust by the Debtors and are not property of their estates.

65. The Debtors seek the authority, but not direction, to (a) continue the 401(k) Plan in the ordinary course of business on a postpetition basis, (b) remit all Unremitted 401(k) Deductions collected in the ordinary course of business, and (c) pay any Unpaid 401(k) Contributions in the ordinary course of business (together, the "Unpaid 401(k) Expenses") if any become due during the pendency of these chapter 11 cases.

**2. Union Pension Plans**

66. One of the Debtors sponsors The Joseph A. Bank Mfg. Co., Inc. Defined Benefit Pension Plan, which is a single-employer defined benefit pension plan as required by the terms of the CBA for the Mid-Atlantic Joint Board, Local 806 (the "Union Pension Plan"). The Debtors make quarterly contributions on behalf of the Union Employees in amounts that are actuarially determined in order to satisfy the minimum funding standards prescribed by the Internal Revenue Code and ERISA and provide the pension benefits specified in the CBA. Over the past 12 months, the Debtors have contributed approximately $320,000 to the Union Pension Plan. As of the Petition Date, the Debtors do not believe that they owe any amounts on account of the Union Pension Plan. The Debtors seek authority, but not direction, to pay any prepetition amounts owed on account of the Union Pension Plan and to continue honoring their Union Pension Plan obligations on a postpetition basis in the ordinary course of business and in a manner consistent with past practices.

**F. Paid Time Off.**

67. In the ordinary course of business, the Debtors provide paid time off to their Employees, including sick pay ("Paid Time Off"). Paid Time Off generally accrues at specified rates up to a maximum amount based on the applicable state limit, if any. Accruals of Paid Time Off, however, are not a current cash payment obligation. Over the past 12 months, the Debtors paid approximately $48 million in Paid Time Off. As of the Petition Date, the Debtors estimate

that approximately $24.1 million in Paid Time Off has accrued. The Debtors do not believe any amounts are owed to Employees on account of the Paid Time off in excess of the $13,650 statutory cap imposed by section 507(a)(4).

68. In addition, the Debtors provide certain other forms of paid and unpaid leave, including, for example, (a) paid holidays, (b) leave under the Family and Medical Leave Act, and (c) other paid and unpaid leaves of absence for personal reasons, including those required by law. Importantly, these other forms of paid and unpaid leave do not involve incremental cash outlays beyond standard payroll obligations.

69. The Debtors believe that the continuation of Paid Time Off is essential to maintaining Employee morale during these chapter 11 cases. Further, the policies are broad-based programs upon which all Employees have come to depend. The Debtors anticipate that their Employees will utilize any accrued Paid Time Off in the ordinary course of business, which will not create any material cash flow requirements beyond the Debtors' regular payroll obligations.

**IV. Postpetition Non-Employee Director Compensation.**

70. Tailored Brands, Inc. maintains a board of directors that includes non-Employee directors. As of the Petition Date, the Debtors' board of directors includes 8 non-Employee directors. The non-Employee Directors currently each receive a $100,000 annual cash retainer, which is paid in advance on a quarterly basis in cash (the "Annual Cash Retainer"). The non-Employee Directors are also entitled to expense reimbursement for out-of-pocket expenses (together with the Annual Cash Retainer, the "Director Compensation"). As of the Petition Date, the Debtors do not owe any amounts on account of Director Compensation. The Debtors believe that they are authorized to pay any postpetition Director Compensation in the ordinary course; however, out of an abundance of caution, the Debtors seek authority to continue to pay the Director

Compensation on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

## Basis for Relief

### I. Sufficient Cause Exists to Authorize the Debtors to Honor the Employee Compensation and Benefits.

#### A. Certain Employee Compensation and Benefits Are Entitled to Priority Treatment.

71. Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle the majority of the Employee Compensation and Benefits to priority treatment. As priority claims, the Debtors are required to pay such claims in full to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(B) (requiring payment of certain allowed unsecured claims for (a) wages, salaries, or commissions, including sick leave pay earned by an individual and (b) contributions to an employee benefit plan). Thus, granting the relief sought herein should only affect the timing of certain payments to the Employees and should not negatively affect recoveries for general unsecured creditors. Indeed, the Debtors submit that payment of the Employee Compensation and Benefits at this time enhances value for the benefit of all interested parties. Finding, attracting, and training new qualified talent would be extremely difficult and would most likely require higher salaries, guaranteed bonuses, and more comprehensive compensation packages than are currently provided to Employees. *See In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 370 (Bankr. S.D. Tex. 2000) ("The need to pay [employee wage] claims in an ordinary course of business time frame is simple common sense. Employees are more likely to stay in place and to refrain from actions which could be detrimental to the case and/or the estate if their pay and benefits remain intact and uninterrupted.").

**B. Payment of Certain Employee Compensation and Benefits Is Required by Law.**

72. The Debtors seek authority to pay the Withholding Obligations to the appropriate third-party entities. These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from the Employees' paychecks. Indeed, certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from the Employees' paychecks on another party's behalf. *See* 11 U.S.C. § 541(b)(1), (d); *see also Equalnet Commc'ns*, 258 B.R. at 370 (noting that, for tax obligations where funds are held by the debtor in trust, "the legal right to payment of such claims at any time appears irrefutable.") (citing *In re Al Copeland Enter., Inc.*, 991 F.2d 233 (5th Cir. 1993)).

73. Further, federal and state laws require the Debtors to withhold certain tax payments from the Employees' paychecks and to pay such amounts to the appropriate taxing authority. 26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes). Because the Withholding Obligations may not be property of the Debtors' estates, the Debtors request that the Court authorize them to transmit the Withholding Obligations to the proper parties in the ordinary course of business.

74. Similarly, state laws require the Debtors to maintain the Workers' Compensation Program. If the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. Payment of all workers' compensation

amounts is therefore crucial to the Debtors' continued operations and the success of the Debtors' ongoing chapter 11 process.

## II. Payment of the Employee and Temporary Staff Compensation and Benefits Is Proper Pursuant to Section 363(b)(1) of the Bankruptcy Code and the Doctrine of Necessity.

75. Section 363(c)(1) of the Bankruptcy Code expressly grants the Debtors the authority to "enter into transactions . . . in the ordinary course of business" and "use property of the estate in the ordinary course of business without notice or a hearing." Therefore, the Debtors believe they are permitted to pay all postpetition amounts due pursuant to the Employee Compensation and Benefits as such actions are in the ordinary course of business. Out of an abundance of caution, however, the Debtors seek entry of an order granting the relief requested herein to avoid any disruptions to their business operations.

76. Courts in the Fifth Circuit have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value. *See, e.g.*, *In re CoServ*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (authorizing payment of certain prepetition claims pursuant to "doctrine of necessity"); *Equalnet Commc'ns*, 258 B.R. at 369–70 (business transactions critical to the survival of the business of the debtor are exceptions to the general rule of nonpayment of prepetition claims prior to plan confirmation); *see also In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. SD.N.Y. 1989) ("The ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."); *Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 398 (S.D.N.Y. 1983). In doing so, these courts acknowledge that several legal theories rooted in sections 105(a), 363(b), and 1107(a) of the Bankruptcy Code support the payment of prepetition claims as provided herein.

77. The relief requested herein may be granted by the Court pursuant to sections 363(b) and 105(a) of the Bankruptcy Code. Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 363(b) of the Bankruptcy Code permits a debtor, subject to court approval, to pay prepetition obligations where a sound business purpose exists for doing so. *See Ionosphere Clubs*, 98 B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification). In addition, under section 1107(a) of the Bankruptcy Code, a debtor in possession has, among other things, the "implied duty of the debtor-in-possession to 'protect and preserve the estate, including an operating business' going-concern value.'" *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *CoServ*, 273 B.R. at 497).

78. In addition, courts may authorize payment of prepetition claims in appropriate circumstances under section 105(a) of the Bankruptcy Code. Section 105(a) of the Bankruptcy Code, which codifies the inherent equitable powers of a bankruptcy court, empowers bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a); *CoServ*, 273 B.R. at 497 (finding that sections 105 and 1107 of the Bankruptcy Code provide the authority for a debtor-in-possession to pay prepetition claims); *CEI Roofing*, 315 B.R. at 60 (finding that "[b]ecause Congress has specifically provided that prepetition wage claims up to a certain amount per claim be elevated to priority status under § 503(1)(3)" the court's job is easier when it considers approval of such prepetition claims); *In re Mirant Corp.*, 296 B.R. 427, 429 (Bankr. N.D. Tex. 2003) (noting that non-payment of prepetition claims may seriously damage a debtor's business). The above-referenced sections of

the Bankruptcy Code therefore authorize the postpetition payment of prepetition claims when the payments are critical to preserving the going-concern value of the debtor's estate, as is the case here. *See, e.g.*, *CoServ*, 273 B.R. at 497 ("[I]t is only logical that the bankruptcy court be able to use [s]ection 105(a) of the [Bankruptcy] Code to authorize satisfaction of the prepetition claim in aid of preservation or enhancement of the estate.").

79. Payment of the Employee Compensation and Benefits is warranted under this authority and the facts of these chapter 11 cases. The majority of the Employees rely exclusively on the Employee Compensation and Benefits to satisfy their daily living expenses. Consequently, Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid Employee Compensation and Benefits. Additionally, continuing ordinary course benefits will help maintain Employee morale and minimize the adverse effect of the commencement of these chapter 11 cases on the Debtors' ongoing business operations.

80. Employees provide the Debtors with services necessary to conduct the Debtors' business, and the Debtors believe that, absent the payment of the Employee Compensation and Benefits, the Debtors may experience turnover and instability at this critical time in these chapter 11 cases. The Debtors believe that, without these payments, the Employees may become demoralized and unproductive because of the potential significant financial strain and other hardships these Employees may face. These Employees may then elect to seek alternative employment opportunities. Additionally, a significant portion of the value of the Debtors' business is tied to their workforce, which cannot be replaced without significant efforts—efforts that might not be successful given the overhang of these chapter 11 cases. Enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario. The Debtors therefore believe that payment of the prepetition obligations with respect to the Employee Compensation and Benefits

is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their Employees as the Debtors seek to operate their business in these chapter 11 cases.

## III. A Limited Waiver of the Automatic Stay for Workers' Compensation Claims Is Appropriate Here.

81. Section 362(a)(1) of the Bankruptcy Code operates to stay:

> [T]he commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . . .

Section 362 of the Bankruptcy Code, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause." 11 U.S.C. § 362(d)(1).

82. The Debtors seek authorization, under section 362(d) of the Bankruptcy Code, to permit their Employees to proceed with their claims under the Workers' Compensation Program in the appropriate judicial or administrative forum. The Debtors believe that cause exists to modify the automatic stay because staying an Employee's workers' compensation claim could have a detrimental effect on the financial well-being and morale of the Employees and lead to the departure of certain Employees. Such departures could cause a severe disruption in the Debtors' business to the detriment of all stakeholders. In addition, as noted above, if the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. The Debtors request a limited waiver of the automatic stay for purposes of allowing the Workers' Compensation Program to proceed.

## Processing of Checks and Electronic Fund Transfers Should Be Authorized

83. The Debtors have sufficient funds to pay the amounts described in this Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations

and anticipated access to cash collateral and debtor in possession financing. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the Employee Compensation and Benefit obligations. The Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. Therefore, the Debtors respectfully request that the Court authorize and direct all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

**Emergency Consideration**

84. The Debtors request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." An immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm. Failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring. The Debtors have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and request that the Court approve the relief requested in this Motion on an emergency basis.

**Waiver of Bankruptcy Rules 6004(a) and 6004(h)**

85. To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**Reservation of Rights**

86. Nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

**Notice**

87. Notice of the hearing on the relief requested in the Motion has been provided by the Debtors in accordance and compliance with Bankruptcy Rules 4001 and 9014, as well as the Bankruptcy Local Rules, and is sufficient under the circumstances. The Debtors served parties in interest, whether by facsimile, electronic mail, overnight courier or hand delivery, including (a) the

Office of the United States Trustee for the Southern District of Texas; (b) entities listed as holding the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the Prepetition ABL Agent and the DIP Agent, and counsel thereto; (d) the agent under the Debtors' prepetition term loan facility and counsel thereto; (e) counsel to term lenders under the Debtors' prepetition term loan facility; (f) the indenture trustee for The Men's Wearhouse, Inc. 7.00% Senior Notes due 2022, and counsel thereto; (g) the Office of the United States Attorney for the Southern District of Texas; (h) the state attorneys general for states in which the Debtors conduct business; (i) the Internal Revenue Service; (j) the Securities and Exchange Commission; (k) the Environmental Protection Agency; (l) any party that requests service pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, no other or further notice need be given.

[*Remainder of page intentionally left blank.*]

WHEREFORE, the Debtors respectfully request entry of the Order, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Houston, Texas
August 2, 2020

*/s/ Victoria Argeroplos*

Matthew D. Cavenaugh (TX Bar No. 24062656)
Kristhy Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
Victoria Argeroplos (TX Bar No. 24105799)
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4200
Facsimile: (713) 752-4221
Email: mcavenaugh@jw.com
kpeguero@jw.com
vpolnick@jw.com
vargeroplos@jw.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Christopher Marcus, P.C. (*pro hac vice* pending)
Aparna Yenamandra (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: joshua.sussberg@kirkland.com
cmarcus@kirkland.com
aparna.yenamandra@kirkland.com

-and-

James H.M. Sprayregen, P.C.
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: james.sprayregen@kirkland.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**Certificate of Accuracy**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/ Victoria Argeroplos*
Victoria Argeroplos

**Certificate of Service**

I certify that on August 2, 2020, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Victoria Argeroplos*
Victoria Argeroplos